UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE SHAWNEE TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   4:20-cv-00290-JED-FHM |
| | ) | |
| STEVEN T. MNUCHIN, in his official capacity | ) | |
| as Secretary of the United Stated Department of | ) | |
| the Treasury; UNITED STATES DEPARTMENT | ) | |
| OF THE TREASURY; DAVID BERNHARDT, in | ) | |
| his official capacity as Secretary of the United | ) | |
| States Department of the Interior; UNITED | ) | |
| STATES DEPARTMENT OF THE INTERIOR | ) | |
| | ) | |
| Defendants. | ) | |

**EX PARTE MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

Pursuant to Federal Rule of Civil Procedure 65, The Shawnee Tribe moves the Court for

a temporary restraining order and preliminary injunction that restrains Defendant Steven T.

Mnuchin ("Secretary Mnuchin"), Secretary of the United States Department of the Treasury

("Treasury"), and the Treasury from disbursing a portion of the remaining CARES Act Title V

funds – at least $12 million – which are being disbursed *this week* and will result in imminent

and irrevocable harm to The Shawnee Tribe.

Disbursements for aid provided under Title V of the CARES Act were calculated by

Treasury based, in large part, on the population of each respective tribe. In calculating the

disbursements for The Shawnee Tribe, however, Secretary Mnuchin and the Treasury used

objectively false data stating it had *zero enrolled members* using HUD race-based data designed

to calculate funding for tribal housing – a program in which The Shawnee Tribe does not

participate. This is true despite the fact that Secretary Mnuchin had accurate enrollment data from

three separate sources demonstrating The Shawnee Tribe had an enrollment population of *no less*

*than 2,113* and as much as *3,021 tribal citizens*. Secretary Mnuchin and the Treasury's use of false data, combined with his steadfast refusal to fix this error, defies all logic and effectively denies The Shawnee Tribe of millions of dollars in relief aid it would be have otherwise been entitled to in under Title V. Despite The Shawnee Tribe's extensive efforts to resolve this matter with Treasury, the only resolution it has offered was to instruct The Shawnee Tribe to sue it. As such, The Shawnee Tribe respectfully requests that Secretary Mnuchin and the Treasury be enjoined from distributing Title V Funds that would otherwise be available to The Shawnee Tribe, or no less than $12 million,[1] had they used readily available and accurate data.

## MEMORANDUM OF LAW

### I.   Brief Background

#### A.   There is no dispute that The Shawnee Tribe is entitled to Title V Funds.

The CARES Act, Pub.L. 116-136, 134 Stat. 281 (2020), which was signed into law on March 27, 2020, was designed to provide economic relief for, among many other individuals, Tribal, state, and local governments impacted by the COVID-19 pandemic. Pursuant to Title V of the CARES Act, which amends the Social Security Act (42 U.S.C. 301 *et seq.*), Congress appropriated $8 billion in direct aid to "Tribal governments" specifically ("Title V Funds"). 42 U.S.C. § 801(a)(2)(B). Title V defines "Tribal governments" as "the recognized governing body of an Indian tribe." *Id*. § 801(g)(5). There is no dispute that The Shawnee Tribe is a federally recognized Tribal government as defined by the CARES Act, and entitled to receive Title V Funds proportionate to a rational and reasonable tally of its total population.

In Title V, Congress specifically directed that:

> From the amount set aside under subsection (a)(2)(B) for fiscal year

---

[1] Because Treasury has failed to disclose the actual calculations for its award amounts, this number cannot be calculated separately and must be determined by the Treasury.

> 2020, ***the amount paid*** under this section for fiscal year 2020 to a Tribal government ***shall be the amount the Secretary shall determine, in consultation with the Secretary of the Interior and Indian Tribes, that is based on increased expenditures of each such Tribal government …*** ***relative to aggregate expenditures in fiscal year 2019 by the Tribal government*** … and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

*Id.* § 801(c)(7) (emphasis added).  In short, the Treasury, in consultation with Interior and Indian Tribes, was given authority to determine the amounts Tribal governments should receive, based on their objective "increased expenditures" relative to fiscal year 2019 aggregate expenditures. The CARES Act did not explicitly authorize the Secretary to adopt a population based formula to determine the amount of funding Tribal governments were to receive under Title V.[2]

### B.     After perfunctory consultation, Treasury solicits information and adopts a population based allocation that is arbitrary and unreasonable.

On April 2, 2020 and April 9, 2020, Treasury and the Interior held telephonic consultation sessions where federal officials heard from representatives of Tribal governments from across the United States. Treasury also solicited written comments from Tribal governments regarding their views on potential methodologies for the allocation of Title V Funds.

On April 8, 2020, the superintendent for the Department of the Interior Bureau of Indian Affairs ("BIA") Miami agency office contacted the Tribe and specifically requested the Tribe's certified tribal member enrollment population.  The Tribe provided the BIA with an enrollment population of ***3,021 tribal citizens***, per its request.

Following the conclusion of the consultation period, on April 13, 2020, Treasury

---

[2] *Compare with* 42 U.S.C. 601(c)(8).  Although Congress mandated that Treasury use United States Census Bureau population data for determining the distribution of Title V Funds to States and units of local government (42 U.S.C. § 601(c)(8)), no such requirement exists for the distribution of funds to Tribal governments. Instead, Tribal governments are treated as a distinct category from state and local governments in Title V. See e.g. Id. at § 601(a)(1) (referencing payments to "States, Tribal governments, and units of local government").

published a form entitled "Certification for Requested Tribal Data" on its website. The

"Certification for Requested Tribal Data" sought individualized enrollment data from all 574

federally recognized Tribal governments. The Shawnee Tribe provided the requested data to

Treasury prior to Treasury's April 17, 2020, deadline. The Shawnee Tribe timely certified

Plaintiff's Actual Tribal Enrollment Metric of 3,021. *See* Exhibit A. Neither the BIA nor

Treasury ever questioned The Shawnee Tribe's enrollment data.

On May 5, 2020, Secretary Mnuchin and Secretary David Bernhardt of the Interior issued

a joint press release announcing the agreed upon plan for allocating the Title V Funds.[3]

According to the plan, Treasury decided to split the Title V Funds into two allocations, which

would base the first sixty percent of the Title V Funds, or $4.8 billion, "on tribal population"

("Population Award"). Secretary Mnuchin's and Secretary Bernhardt's reasoning was that "Tribal

population [was] expected to correlate reasonably well with the amount of increased expenditures

of Tribal governments related directly to the public health emergency, such as increased costs to

address medical and public health needs."[4] For tribes with a population of less than 37 members,

a minimum payment of $100,000 would be awarded.[5] This plan was never discussed with the

tribal governments as required by the express language of Title V.

### C.      Without consultation with the Tribes, Treasury uses grossly inaccurate IHBG's Race-Based Data containing inaccurate population data.

Despite The Shawnee Tribe providing enrollment data of over 3,000 members only

weeks earlier, the Treasury elected to allocate the Population Award based "on population data

used in the distribution of the Indian Housing Block Grant," ("IHBG"), under the Department of

---

[3] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited June 16, 2020).
[4] *Id.*, p. 2.
[5] *Id.*, p. 3.

Housing and Urban Development ("HUD").[6] According to Treasury, it adopted the IHBG data because it was purportedly a "reliable and consistently-prepared" metric. Under the IHBG race-based data, ***twenty-five Tribal governments, including The Shawnee Tribe***, are listed as having a population of ***zero***, a practical impossibility ("IHBG Race-Based Data").[7] Within the same IHBG data, HUD also reports that The Shawnee Tribe has ***2113 enrolled members*** ("IHBG Enrollment Data"). *See* Exhibit B. Although HUD maintains enrollment population data for tribes, it is for the sole purpose of calculation and distributing HUD funds, which The Shawnee Tribe does not receive and is, thus, erroneously undercounted.

Treasury sought to use IHBG Race-Based Data, though it already had The Shawnee Tribe's enrollment data from three separate reliable sources, namely, from the BIA, the tribe itself, and within the internally inconsistent HUD data. At no time prior to the Treasury's May 5, 2020 announcement did it give The Shawnee Tribe or any other tribal government notice that it might utilize the ill-fitting IHBG Race-Based Data, rather than the accurate population data solicited directly from the tribes, or readily available data through the IHBG Enrollment Data and the BIA.

**D.** **The Shawnee Tribe made extensive efforts to correct Treasury's obvious error, which resulted in grossly understated Title V Funds award.**

The same day that Treasury released its allocation plan, on May 5, 2020, it announced the first round of funding consisting of $4.8 billion. Based on the Treasury's Population Award calculations, The Shawnee Tribe received only $100,000, which was the minimum allocation

---

[6] U.S. Dept. of the Treasury, Joint Statement by Treasury Secretary Steven T. Mnuchin and Secretary of the Interior David L. Bernhardt on Distribution of Coronavirus Relief Fund Dollars to Native American Tribes, https://home.treasury.gov/news/press-releases/sm998, (last visited Jun. 16, 2020).

[7] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, p. 2 (last visited June 16, 2020).

based on the IHBG Race-Based Data showing it had zero population.[7] Treasury opted to use the IHBG Race-Based Data showing The Shawnee Tribe has zero population, even though The Shawnee Tribe has an official enrollment of 3,021 tribal members, and even though HUD has an enrollment number of 2,113 for the Shawnee Tribe.

The Shawnee Tribe immediately sought to determine why Treasury used the obviously incorrect population number. On May 13, 2020, on a conference call with Tribal leaders and Dan Kowalski, Senior Counselor to Secretary Mnuchin, The Shawnee Tribe's Chief, Ben Barnes, raised a question about how it was possible for a tribe to be listed as having zero citizens. Chief Barnes further asked if there was a challenge process to correct what was clearly a clerical or accounting error. Mr. Kowalski's response was that he understood the issue but that there was no recourse for the Tribe.

The Shawnee Tribe began pursuing other potential administrative recourse, including outreach communications to Mr. Kowalski, White House staff, and Interior staff. Various staff members conveyed to The Shawnee Tribe and its representatives that Treasury realized its error and was working on a potential solution. The Shawnee Tribe also enlisted the support of congressional representative. On May 28, 2020, several members of Congress sent a letter to the Secretary seeking a resolution to this clear error. *See* Exhibit C. Representative Mark Wayne Mullin and his staff spoke to Mr. Kowalski or his staff on multiple occasions. On or about June 8, 2020, Rep. Mullin offered a potential solution for The Shawnee Tribe. Mr. Kowalski advised Rep. Mullin that he would take the solution to Secretary Mnuchin. Ultimately, Treasury responded to Rep. Mullin on June 10, 2020 that they acknowledged some tribe's populations were zeroed out and other's populations were drastically reduced. Nonetheless, Treasury decided they would not distribute any additional money to the negatively

impacted tribes. Instead, Treasury advised Rep. Mullin that *if a tribe has an issue with their amount (or lack thereof), they should file a lawsuit.*

Despite this statement, on June 12, 2020 Treasury announced the methodology for the second allocation of funds, which indicated that The Shawnee Tribe would have recourse to recover its appropriated allocation of the Title V Funds.[8] In Treasury's updated "Coronavirus Relief Fund, Allocation to Tribal Governments, June 12, 2020" (attached as Exhibit D), it stated, in part, that "Treasury has determined to reserve $679 million from amounts that would be paid to Tribal governments, which represents an estimate of the difference in total payment amounts to Tribal governments if Treasury had made population-based payments based on tribal enrollment data provided by the Bureau of Indian Affairs . . . . These reserved funds would be available to resolve any potentially adverse decision in litigation on this issue . . . ." Treasury emphasized in its June 12, 2020 statement of policy that the reservation of such funds was necessary to address claims for additional payment presented in litigation because "the Judgment Fund is unavailable to compensate plaintiffs seeking additional CARES Act payments."  The Shawnee Tribe relied on this statement of policy and fully expected to be able to seek its appropriate allocation of funds from the amount Treasury planned to hold in reserve.

On June 15, however, the District Court for the District of Columbia ordered the Secretary to disburse these reserved funds no later than June 17, 2020.  *See* Exhibit E, Order in *Agua Caliente Band of Cahuilla Indians et al. v. Mnuchin*, 20-cv-01136 (APM), pp. 2-3. Treasury is in the process of disbursing the remaining $679 million of Title V Funds because it has been ordered to do so, after which the funds will be exhausted and The Shawnee Tribe may be left without an adequate remedy.

---

[8] U.S Dept. of the Treasury, Tribal Allocation Methodology for Second Distribution, https://home.treasury.gov/system/files/136/Tribal-Allocation-Methodology-for-Second-Distribution.pdf (last visited June 16, 2020).

To date, Treasury has refused to revisit its use of objectively false data and, instead, has instructed The Shawnee Tribe to sue it. As such, this lawsuit ensued.

## II.    Law and Argument

### A.    <u>The Shawnee Tribe is entitled to injunctive relief.</u>

A plaintiff seeking a preliminary injunction must establish (1) likely success on the merits, (2) irreparable harm in the absence of injunctive relief, (3) the threatened injury outweighs the harm the injunction will cause the opposing party; and (3) the injunction, if issued, will not adversely affect the public interest. *See Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

#### 1.    The Shawnee Tribe is likely to be successful in its Administrative Procedure Act claim.

The Administrative Procedure Act ("APA") authorizes judicial review of federal agency action. 5 U.S.C. § 702. Pursuant to the APA, a reviewing court shall hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (5 U.S.C. § 706(2)(A)), or that fails to observe procedure required by law (5 U.S.C. § 706(2)(D)). The role of the court under the APA is to "ensur[e] that agencies have engaged in reasoned decision making." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Courts must review "whether the agency examined the ***relevant data and articulated a satisfactory explanation*** for its action including a rational connection between the facts found and the choice made, and whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 49 (D.C. Cir. 2019) (internal quotations omitted and emphasis added). "[W]here the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the courts]

must undo its action." *BellSouth Corp. v. F.C.C.*, 162 F.3d 1215, 1222 (D.C. Cir. 1999) (citation and quotation omitted).

First, the Treasury selected a formula for calculating the Title V funds in lieu of alternative formulas offered by the tribes – without explanation and without ever consulting the tribal governments as required by the plain language of Title V. The plain language of Title V grants the Secretary discretion to determine the amount of Title V funds to which each tribe is entitled but only in consultation with the Indian tribes. 42 U.S.C. § 801(c)(7) (emphasis added). Treasury never provided notice to, or discussed with, tribal governments its population-based formula before selecting it, as required by the plain language of Title V, let alone provided any valid explanation for pursuing this plan over other more reasonably offered plans.

Second, even if Treasury's formula was proper or beyond challenge, it used objectively false data in its calculations. Title V requires Treasury to base its award of funds on the actual "increased expenditures of each such Tribal government" compared to the prior year. In order to do so, Treasury elected to use IHBG Race-Based Data because allegedly tribal governments are "familiar" with this data and have had an "opportunity to scrutinize and challenge its accuracy."

Treasury's reasoning for selecting this data is unfounded. The IHGB data is strictly used to determine funding under the Department of Housing and Urban Development program for tribal housing, ***a program in which The Shawnee Tribe does not participate.*** The Shawnee Tribe, like many others, do not seek funds under the IHGB program; thus, it has no reason to scrutinize or challenge the accuracy of the numbers used for funding under that program. Indeed, twenty-five tribes have a population of *zero* in the IHGB Race-Based Data.

Stated differently, these tribes simply do not exist for the purposes of IHGB because they do not participate in that program. The IHBG Race-Based Data, therefore, plainly and directly refutes Treasury's assertion that Tribal governments have familiarity with the metric and that the data is reliable. These "zeroes" establish that at least twenty-five tribes have taken no action to correct their apparent extinction in this dataset. (*See Id*.)

Moreover, Treasury further described the IHBG Race-Based Data as "reliable and consistently-prepared," despite this information being contradicted by other reliable sources and common sense. (*Id*.). The Treasury requested – but ignored – The Shawnee Tribes' enrollment population, which it timely provided. Moreover, the Treasury worked in conjunction with the BIA that also requested and received The Shawnee Tribes' accurate enrollment data. Tellingly, within the IHGB data itself, the zero population provided in that data was contradicted merely four columns over where enrollment data reflected that The Shawnee Tribe had 2113 members.[9]

Not only did the Treasury use objectively false data, but the data it did rely upon simply defies logic. According to the Treasury's own tabulation, twenty-five tribes have a population of *zero* in the IHGB Race-Based Data.  This illogical conclusion that The Shawnee Tribe does not exist directly contradicts federal law recognizing it as a separate federally recognized Tribe over whom it governs citizens. *See* Public Law 106-568 (The Shawnee Tribe Status Act of 2000). Additionally, the IHGB data is internally inconsistent and contradicted by its own reports that The Shawnee Tribe has *2113 members*. Equally nonsensical is the fact that

---

[9] The fact that this number is nearly a 1,000 less members demonstrates it is outdated and went uncorrected by The Shawnee Tribe because it does not receive IHBG funds and has no reason to correct data for a program in which it does not participate.

The Shawnee Tribe received $100,000 for members that simply do not exist.[10]

Finally, despite Treasury being informed of its clear error as early as May 13, Treasury has steadfastly refused to correct this error.  Treasury has had numerous conversations with the congressional representatives and others who have sought to resolve this error through an "administrative" effort.  But, nonetheless, Treasury's failure to correct this clear error – a clear error Treasury admits and acknowledges – is irrational and contrary to the law.

Based on the foregoing, Treasury's reliance on the IHBG Race-Based Data – based on a rationale that was contradicted by the IHBG data itself – and its irrational refusal to correct its error was arbitrary and capricious. *See Hogen*, 613 F.3d at 190 (D.C. Cir. 2010) (overturning Interior land-into-trust action that relied on a basis contradicting other information in the record); *County of Los Angeles v. Shalala*, 192 F.3d1005, 1023 (D.C. Cir. 1999) (vacating and remanding HHS determination regarding Medicare payments that provided inadequate rationale and failed to consider more recent information). Plaintiff, therefore, presents a high likelihood of success on the merits.

### 2.    Irreparable harm will occur if injunctive relief if not awarded.

The injury faced by Plaintiff is certain and not theoretical. If this Court fails to restrain Secretary Mnuchin, Treasury will disburse the remaining $679 million in Title V funds ***this week*** and permanently ratify its flawed allocation approach. Treasury's approach undercounts at least 3,000 Shawnee Tribe citizens – ***or 98% of its population*** – resulting in a Population Award shortfall of approximately $12,000,000 for The Shawnee Tribe alone. The Shawnee Tribe's claim to these funds will be forever foreclosed by their delivery unto other Tribal governments

---

[10] Indeed, the IHBG provides no data at all in some instances, let alone reliable data (*Id.*), for four percent of the Tribal governments for which IHBG Metric is maintained. (IHBG SS, Rossetti Dec., Ex. G).

and they cannot be recouped. The Title V funds will then be exhausted, leaving The Shawnee

Tribe irreparably harmed.

> ### 3.    The threatened injury outweighs the harm the injunction will cause the opposing party.

The Treasury and Secretary Mnuchin acknowledges no harm will come to them if the

funds to which The Shawnee Tribe seek are withheld from distribution. Today, The Shawnee

Tribe faces the loss of millions of dollars desperately needed to aid its citizens based on

objectively false data, as discussed above. Meanwhile, Secretary Mnuchin agrees that continuing

to withhold these distributions is appropriate, as a policy matter, "'to resolve any potentially

adverse decision in litigation' over Defendant's methodology for calculating disbursements from

CARES Act appropriation for Tribal governments." *See* Exhibit E, p. 2. The District Court for

the District of Columbia ordered the Secretary to disburse these reserved funds, primarily

because there was no other injunctive order preventing such disbursement and Secretary

Mnuchin cannot continue to holds these funds on his own "accord." *See id.*, pp. 2-3.[11] Thus, all

parties agree that withholding the remaining Title V funds that would solely apply to Oklahoma

tribes, or in the alternative, the $12 million The Shawnee Tribe would have otherwise received

had reliable data been used, is appropriate and no harm will come to Treasury or Interior who has

no use for those funds.

---

[11] The Court also found extensive delay in releasing other tribes' funding, which is not at issue here. *See* Exhibit E, pp. 3-5 (stating that Agua Caliente had sought to prevent distribution of 90% of the Title V Funds).

**4.      The injunction, if issued, will not adversely affect the public interest.**

The Shawnee Tribe does not seek to withhold funds properly distributed to other tribes. Rather, it seeks an order enjoining Treasury from disbursing only those Title V Funds that The Shawnee Tribe would have otherwise received – and to which it is entitled – had accurate and reliable data been used in calculating those disbursements. Other tribes receiving those funds based on false data have no legitimate basis to claim those funds; thus, they are not adversely affected by granting injunctive relief to The Shawnee Tribe here. On the other hand, refusing to issue injunctive relief here will greatly harm The Shawnee Tribe members, which are experiencing extraordinary hardship due to COVID-19 related issues that the Title V Funds were designed specifically to address.

**5.      The Shawnee Tribe has not delayed in bringing this lawsuit and seeking this temporary restraining order.**

As discussed above, The Shawnee Tribe was not notified of the Treasury's decision regarding its formula or use of the IHBG Race-Based Data until May 5, 2020. Since that date, The Shawnee Tribe has been engaged in extensive discussions and administrative efforts to resolve this matter, enlisting the assistance of a congressional representative, despite the fact that the CARES Act provides little guidance in this regard. Even the Treasury representatives acknowledged that their calculations were flawed and ostensibly worked with The Shawnee Tribe to resolve the issue.

As recently as June 12, 2020, it was represented to The Shawnee Tribe that it would have recourse to recover its appropriate allocation of CARES Act funds.  On that date, Treasury issued its updated "Coronavirus Relief Fund, Allocation to Tribal Governments, June 12, 2020" (Exhibit D), stating in part that "Treasury has determined to reserve $679 million from amounts that would be paid to Tribal governments, which represents an estimate of the difference in total

13

payment amounts to Tribal governments if Treasury had made population-based payments based on tribal enrollment data provided by the Bureau of Indian Affairs . . . . These reserved funds would be available to resolve any potentially adverse decision in litigation on this issue . . . ." Treasury emphasized in its June 12, 2020 statement of policy that the reservation of such funds was necessary to address claims for additional payment presented in litigation because "the Judgment Fund is unavailable to compensate plaintiffs seeking additional CARES Act payments."  The Shawnee Tribe relied on this statement of policy and fully expected to be able to seek its appropriate allocation of funds from the amount Treasury planned to hold in reserve.

On June 15, 2020, however, the rug was pulled out from under the Tribe.  On that date, Treasury was ordered by the D.C. District Court to dispense such funds notwithstanding its acknowledgment that they would be needed to resolve anticipated claims for an appropriate allocation – a ruling that defies logic and is so counterproductive as to be truly astonishing.  (See Exhibit E).  The present action and request for emergency relief by The Shawnee Tribe were prepared and filed as soon as humanly possible after that event.

There has been no delay by The Shawnee Tribe whatsoever in seeking to protect its rights.  What occurred on June 15, 2020 was a seismic shift from the events that occurred prior to that date, namely, that Treasury would withhold sufficient funds to resolve anticipated claims for an appropriate allocation of CARES Act funds to tribes such as The Shawnee Tribe whose numbers are not reflected in the IHBG program.  Through significant and urgent effort, The Shawnee Tribe prepared and filed this action almost immediately.  Relief is urgently needed to preserve the recourse to which The Shawnee Tribe had access only a few days earlier.

**B.**     <u>**The ex parte nature of this Motion is proper**</u>.

Pursuant Federal Rule of Civil Procedure 65, a temporary restraining order may be issued without written or oral notice to the adverse party where the facts clearly show immediate or irreparable harm will result to the movant before the adverse party can respond, and efforts were made to give notice to the opposing party. Treasury intends to disburse the remaining Title V Funds *today*, after which the funds will be exhausted. Treasury has already declined to issue more funds to rectify this matter and The Shawnee Tribe will be left without a remedy and irreparably harmed.

Moreover, The Shawnee Tribe has provided Treasury and Secretary Mnuchin notice of this forthcoming lawsuit and the injunctive relief sought on June 17, 2020, and requested to discuss the same. This notice is in addition to the extensive communications with Treasury to resolve this matter administratively, at which point Treasury instructed The Shawnee Tribe to sue it. Thus, Defendants cannot claim any surprise by this lawsuit or the injunctive relief sought.

**III.    Conclusion**

The Shawnee Tribe has over 3,000 enrolled members, a fact that neither the BIA, Interior nor Treasury has ever disputed. Yet, Treasury calculated The Shawnee Tribe's award of Title V Funds based on *zero enrolled members* as reflected in by the IHBG Race-Based Data, without notice to The Shawnee Tribe. Treasury has refused to revisit its use of objectively false data and, instead, has instructed The Shawnee Tribe to sue it. In the meantime, Treasury intends to disburse those funds today, after which they will be exhausted and forever gone, resulting in irreparable harm to The Shawnee Tribe that cannot be undone. Thus, The Shawnee Tribe respectfully requests an order temporary enjoining Treasury from distributing Title V Funds that would otherwise be available to The Shawnee Tribe, or no less than $12 million, until such time

that readily available and accurate data can be used to allocate funds to the Shawnee Tribe from the Title V.

Dated this 18th Day of June, 2020.


_____/s/ Gregory Bigler_____
Gregory Bigler (OK Bar No. 11759)
BIGLER LAW
P. O. Box 1927
Sapulpa, Oklahoma 74067

Pilar M. Thomas (pro hac vice pending)
QUARLES & BRADY LLP
One South Church Avenue, Suite 1800
Tucson, Arizona 85746

Nicole L. Simmons (pro hac vice pending)
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391

*Attorneys for Plaintiff*